In re:                          )
                                )
SSI Technology, Inc.,           )    Case No. 14-55306-mbm
                                )    Chapter 11
            Debtor.             )    Hon. Marci B. McIvor
                                )

## DEBTOR'S SECOND COMBINED PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT

**THE PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN CONNECTION WITH THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OF REORGANIZATION DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS COMBINED PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT ARE NOT INTENDED TO BE AND SHOULD NOT IN ANY WAY BE CONSTRUED AS A SOLICITATION OF VOTES ON THE PLAN. NOR SHOULD THE INFORMATION CONTAINED HEREIN BE RELIED ON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THE PROPOSED DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION.**

**DEBTOR EXPRESSLY RESERVES ITS RIGHT TO AMEND THIS COMBINED PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT.**

SSI Technology, Inc. proposes the following Plan of Reorganization.

## ARTICLE I

### DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

A. As used in this Plan, the following terms shall have their respective meanings specified below, unless the context requires otherwise:

1. "Aactron" means Aactron, Inc.

2. "Aactron Secured Claim" means Aactron's secured claim in the amount of $2,286.25

1

3.    "Administrative Creditor" means any Creditor entitled to payment of an Administrative Expense.

4.    "Administrative Expense" means any cost or expense of administration of this Chapter 11 case allowed under §503 of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving Debtor's estate, any actual and necessary expenses of operating the business of Debtor, including loans and other advances to Debtor, and all allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under §330 and §503 of the Bankruptcy Code.

5.    "Allowed Claim" means a Claim or such portion of a Claim: (a) that has been timely filed with the Clerk of the Court, or filed late with leave of the Bankruptcy Court after notice and opportunity for hearing given to counsel for Debtor and the Committee, or filed with such other person as the Court may direct which has not been objected to as provided in Article XII of this Plan, or which is listed by Debtor as not disputed, contingent or unliquidated in the schedules, in each case within such time as may be prescribed by the Bankruptcy Rules, or by Final Order of the court; or (b) that has been allowed by a Final Order of the Court. Unless otherwise specified herein or by a Final Order, "Allowed Claim" shall not include post-petition interest on such claim.

2

6.  "Avoidance Actions" means all claims of Debtor under Chapter 5 of the Bankruptcy Code.

7.  "Ballot" means the ballot upon which a holder of a Claim that is impaired pursuant to the terms of this Plan and is otherwise entitled to vote shall cast its vote to accept or reject the Plan.

8.  "Bankruptcy Code" means the United States Bankruptcy Code, as amended (11 U.S.C. §101 *et. seq.*).

9.  "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division, having jurisdiction over this Case.

10.  "Bankruptcy Rules" means the Rules and, to the extent applicable, the Local District Rules and the Local Rules.

11.  "Bar Date" means the applicable bar date by which a proof of Claim must be or must have been filed, as established by an order of the Bankruptcy Court, including the Bar Date Order. Pursuant to the Bar Date Order, the Bar Date was January 28, 2015.

12.  "Bar Date Order" means the Order Establishing Deadlines and Procedures [Docket No. 83], entered by the Bankruptcy Court on October 30, 2014, as it may be amended, supplemented or otherwise modified.

13.  "Bloom" means Robert A. Bloom, the sole shareholder, President and CEO of Debtor.

3

14. "Bloom Secured Claim" means Bloom's secured claim in the amount of $814,572.63.

15. "Case" means the proceeding under Chapter 11 of the Bankruptcy Code which is presently captioned In Re: SSI Technology, Inc., Case No. 14-55306-mbm which is pending in the Bankruptcy Court.

16. "Cash" means legal tender of the United States of America and equivalents thereof.

17. "Claim" means any claim against Debtor as defined in §101(5) of the Bankruptcy Code.

18. "Committee" means the Official Committee of Unsecured Creditors which has been appointed in this Case by the Office of the U.S. Trustee.

19. "Confirmation Date" means the date upon which the Bankruptcy Court shall enter an order confirming this Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

20. "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to §1129 of the Bankruptcy Code, as it may be subsequently amended, supplemented or otherwise modified.

21. "Contested Claim" means any claim as to which Debtor has interposed an objection or commenced an adversary proceeding in accordance with the Bankruptcy Rules, which

4

objection has not been determined by order or judgment no longer subject to appeal.

22. "Creditor" means any person who has a Claim against Debtor that arose on or before the Petition Date or a claim of any kind specified in §502(g), §502(h) or §502(i) of the Bankruptcy Code.

23. "Debtor" means SSI Technology, Inc., a Michigan corporation.

24. "Distribution" means any initial or subsequent payment or transfer made on account of an Allowed Claim under or in connection with the Plan.

25. "Effective Date" means the fifteenth (15th) day after the Confirmation Date; provided, however, that no appeal of the Confirmation Order has been filed. In the event that such an appeal is filed, the Effective Date shall mean and refer to the fifteenth (15th) day after the Confirmation Order becomes final and binding upon all parties.

26. "Exide" means Exide Technologies.

27. "Exide Secured Claim" means Exide's secured claim in the amount of $963,186.66.

28. "Final Order" means an Order of the Bankruptcy Court as to which (i) the time for appeal has expired and no appeal has been timely taken; or (ii) any appeal that has been timely taken and has been finally determined or dismissed; or

5

(iii) an appeal has been timely taken but such order has not been stayed within fifteen (15) days after the filing of such appeal.

29. "Independent Bank" means Independent Bank, a Michigan banking corporation.

30. "Independent Bank Secured Claim" means the amount owing to Independent Bank, and consists of the sum owing pursuant to the Line Note Indebtedness and the Term Note Indebtedness. As of the Petition Date, the amount of the Independent Bank Secured Claim was approximately $1,954,000.

31. "Interest" means the rights of the equity security holder, Bloom, as these rights are governed by applicable corporate law.

32. "Lee" means Lee Precision Machine Shop, Inc.

33. "Lee Claims" means Debtor's claims against Lee as set forth in the complaint filed by Debtor against Lee in the Lee Litigation (and any other claims Debtor may have against Lee).

34. "Lee Litigation" means the action pending in the United States District Court for the Eastern District of Michigan in Case No. 13-14831-AC-PJK, in which Debtor has asserted claims against Lee and Lee has asserted claims against Debtor.

6

35. "Lee Proceeds" means the net amount received by Debtor with respect to the Lee Claims (after subtracting any and all attorneys' fees and costs relating to the Lee Litigation).

36. "Line Note" means that certain Demand Promissory Note (Revolving Line of Credit)(Amended and Restated) issued by Debtor to Independent Bank dated May 29, 2014 in the stated principal amount of One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00).

37. "Line Note Indebtedness" means all principal, interest, costs and expenses, including reasonable attorney fees heretofore, now or hereafter incurred by Independent Bank in connection with the Line Note, including the administration of this bankruptcy proceeding.

38. "Local District Rule(s)" means the Local Rules of the United States District Court for the Eastern District of Michigan, as amended.

39. "Local Rule(s)" means the Local Rules of the Bankruptcy Court for the Eastern District of Michigan, as amended.

40. "Net REA Claim Proceeds" means the amount recovered by Debtor from the REA Claim after subtracting the fees and costs incurred by Debtor in connection with its pursuit of the REA Claim, including, but not limited to, the fees and

costs paid to James Bucrek and to Clark Hill in connection with the REA Claim.

41. "Notice" has the meaning ascribed to it in Article XIV.

42. "Payment Commencement Date" means the first day of the first month after the Effective Date.

43. "Person" means an individual, corporation, limited liability company, partnership, association, a trust or any other entity, as set forth more fully in Section 101(41) of the Bankruptcy Code.

44. "Petition Date" means the date this Case was filed, September 30, 2014.

45. "Plan" means this Plan of Reorganization, either in its present form or as it may be altered, amended, supplemented or modified from time to time.

46. "Priority Claim" means any Claim or portion of a Claim, other than an Administrative Expense which is entitled to priority in payment under §507(a) of the Bankruptcy Code.

47. "Priority Creditor" means any Creditor that holds a Priority Claim.

48. "Professionals" refers to those professionals retained by Debtor or the Committee who hold Administrative Expenses. Professionals include, but are not necessarily limited to: Amherst Capital Partners, L.L.C.; Williams, Williams,

Rattner & Plunkett; Jacob & Weingarten; and Schafer & Weiner PLLC.

49. "REA Claim" collectively means: (a) the Request for Equitable Adjustment filed by Debtor with the United States Army Tank-Automotive & Armaments Command ("TACOM") on or about February 25, 2014; and (b) the REA Cost Proposal, as may be amended.

50. "Real Property Lease" means that certain lease for the premises presently occupied by Debtor between K.R. Kenneth, L.L.C. and Debtor dated May 19, 2006 and as amended on June 7, 2011.

51. "Reorganized Debtor" means SSI, Inc. as reorganized pursuant to the confirmation of this Plan.

52. "Rule(s)" means the Federal Rules of Bankruptcy Procedure.

53. "Secured Claims" means the Claims of Independent Bank, Bloom, and Exide.

54. "Secured Creditors" means Independent Bank, Bloom, and Exide.

55. "Substantial consummation" has the meaning set forth in section 1101(2) of the Bankruptcy Code, which reads ". . . (A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by Debtor or by the successor to Debtor under the plan of the business or

9

of the management of all or substantially all of the property dealt with by the plan: and (C) commencement of distribution under the plan."

56. "Term Note" means that certain Consolidated Amended and Restated Promissory Note (Term Loan) issued by Debtor to Independent Bank dated May 29, 2014 in the stated principal amount of Four Hundred Sixty-Seven Thousand Three Hundred Forty-Four and 04/100 Dollars ($467,344.04).

57. "Term Note Indebtedness" means all principal, interest, costs and expenses, including reasonable attorney fees heretofore, now or hereafter incurred by Independent Bank in connection with the Term Note, including the administration of this bankruptcy proceeding.

58. "Unsecured Claim" means any unsecured Claim other than a Claim for an Administrative Expense or a Priority Claim.

59. "Unsecured Creditor" means any Creditor that holds an Unsecured Claim.

B. For purposes of the Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other

agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or exhibit filed or to be filed shall mean such document or exhibit, as it may have been or may be amended, restated, supplemented or otherwise modified pursuant to the Plan, the Confirmation Order or otherwise; (d) any reference to a Person as a holder of a Claim includes that Person's successors, assigns and affiliates; (e) all references to sections or exhibits are references to sections and exhibits of or to the Plan; (f) the words "herein," "hereunder," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent not inconsistent with any other provision of this section.

C.   In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE II

### TREATMENT OF CLAIMANTS NOT SUBJECT TO CLASSIFICATION OR OTHERWISE NOT REQUIRED TO VOTE FOR OR AGAINST THE PLAN

For the purposes of approval and implementation of this Plan and the resultant reorganization of Debtor, Administrative Creditors and Priority Creditors shall be paid on account of their respective Administrative Expenses and Priority Claims in accordance with the provisions set forth below.

A.   <u>Group I</u>. Group I consists of the Administrative Expenses owing to the Administrative Creditors. Payments to the members of this Group shall begin on the Effective Date. Debtor estimates that there will be approximately $720,000 in Administrative Expenses, consisting entirely of Administrative Expenses owing to Professionals (not counting normal post-petition indebtedness incurred in the ordinary course of business, which will continue to be paid in the ordinary course of business).

Bankruptcy Code §1129(a)(9) requires Administrative Creditors to be paid in full on the Effective Date, except to the extent the holder of a particular Administrative Expense has agreed to a different treatment of its Administrative Expense.

12

Debtor does not have sufficient Cash to pay the Administrative Expenses of the Professionals on the Effective Date. To the extent any of the Professionals have awarded fees and costs in excess of the amount held by each respective Professional in its client trust account, Debtor will pay such shortfall (the "Shortfall") over time by paying an aggregate of $30,000 per month commencing on the Effective Date and on each month thereafter until the Administrative Expenses of the Professionals are paid in full. Such monthly payments shall be distributed pro-rata to each of the Professionals based on the Shortfall of each Professional, respectively, in proportion to the aggregate amount of the Shortfall of all of the Professionals. Debtor anticipates that the Shortfall of all of the Professionals will be paid in full within 24 months after the Effective Date. To the extent it has not done so, each Professional shall be entitled to apply the Cash in its client trust account against the fees and costs awarded to such Professional. Confirmation of this Plan is dependent upon the agreement of the Professionals to getting their Administrative Expenses paid in the manner provided for herein.

B.   <u>Group II</u>.   Group II shall consist of the Priority Claims held by: the Internal Revenue Service; the State of Michigan, Department of Treasury; the Unemployment Insurance Agency; and the City of Detroit. The IRS has filed a Priority

13

Claim in the amount of One Hundred Fifty-Eight Thousand Five Hundred Six and 52/100 Dollars ($158,506.52) for unpaid federal employment taxes. The State of Michigan, Department of Treasury has filed a Priority Claim in the amount of Thirty-Nine Thousand Sixty Two and 56/100 Dollars ($39,062.56) for unpaid State of Michigan business taxes and withholding taxes. Such amount includes an estimate for August 2014 withholding taxes and an estimate for 2011 Michigan business taxes. Debtor has provided (or will shortly provide) information to the State of Michigan with respect to the actual amount of such taxes. As a result, Debtor believes that the State of Michigan Priority Claim will increase to something in excess of $100,000. Debtor is guesstimating that the Priority Claim will be in the neighborhood of $130,000. The Unemployment Insurance Agency has filed a Priority Claim in the amount of Fifty-Nine Thousand Three Hundred Twenty-Two and 21/100 Dollars ($59,322.21) for unpaid unemployment contributions. Debtor has scheduled a Priority Claim owing to the City of Detroit in the amount of $2,201.41. To the extent the IRS, the State of Michigan, the Unemployment Insurance Agency, and/or the City of Detroit have Priority Claims against Debtor, such Priority Claims shall be paid in full in equal monthly payments beginning on the twentieth day of the first full month after the Confirmation Date and continuing on the twentieth day of each consecutive

14

month thereafter until paid in full. The Priority Claims of the taxing authorities shall be paid in full within sixty (60) months of the Petition Date and shall receive statutory interest. As such, the Priority claims will be paid in full on or before September 30, 2019. Debtor has **estimated** that the taxing authorities will each receive forty eight (48) monthly payments as follows:

| Taxing Authority | Priority Claim | Interest Rate | Monthly Payment |
|---|---|---|---|
| IRS | $158,506.52 | 3.0% | $3,508.44 |
| State of Michigan | $130,000 | 4.25% | $2,900 |
| UIA | $59,322.21 | 4.25% | $1,346.09 |
| City of Detroit | $2,201.41 | 4.25% | $49.95 |

Upon Debtor's failure to make any payment due on these Priority Claims, which is not cured within 30 days of the mailing of a written notice of default by the applicable Priority Creditor, such Priority Creditor may exercise all rights and remedies applicable under non-bankruptcy law for the collection of its entire Priority Claim and/or seek appropriate relief from the Bankruptcy Court. As long as the monthly payments are being made on these Priority Claims, the Priority

Creditors shall not take any action against Debtor or any third party to assess or collect any portion of its respective Priority Claim.

C. _Determination of Priority Claims_. Debtor shall have the right to challenge any Priority Claim through the claims objection process set forth in Article XII of this Plan or any other applicable process.

**ARTICLE III**

**TREATMENT OF CLASSES OF CLAIMS AND INTERESTS UNDER THE PLAN**

**A.   TREATMENT OF SECURED CLAIMS**

Valuation Of Collateral With Respect To Secured Claims

As of the Petition Date, there were three Claims secured by all asset liens, which Secured Claims are in the following order of priority: (1) Independent Bank; (2) Bloom; and (3) Exide. The Secured Claims totaled approximately $3,730,000 as of the Petition Date. Not counting the REA Claim and the Lee Claims, Debtor believes that the value of the collateral held by the Secured Creditors as of the Petition Date was approximately $2.3 million. In the REA Claim, Debtor has requested approximately $4.3 million and in the Lee Litigation, Debtor has requested millions of dollars in damages. As such, the determination of whether Bloom and Exide, respectively, are over-secured, partially secured (and partially unsecured), or totally

16

unsecured will not be known until the REA Claim and the Lee Claims have been settled or fully litigated.

The following illustrations show the secured/unsecured positions of the three Secured Creditors assuming that Debtor receives Net REA Claim Proceeds and Lee Proceeds in the following amounts: $0; $1 Million; or $1.5 Million or more.

| $0 Recovery: | Independent Bank would have a fully secured claim; |
| | Bloom would have a secured claim in the amount of $346,000 and an unsecured claim in the amount of $468,572.63; |
| | Exide would have a fully unsecured claim. |
| $1 Million Recovery: | Independent Bank would have a fully secured claim; |
| | Bloom would have a fully secured claim; |
| | Exide would have a secured claim in the amount of $531,427.40 and an unsecured claim in the amount of $431,759.26. |
| $1.5 Million Recovery or greater: | Independent Bank would have a fully secured claim; |
| | Bloom would have a fully secured claim; |
| | Exide would have a fully secured claim. |

1.    Class I.  Class I shall consist of the Independent Bank Secured Claim. As of June 12, 2015, the balance due on Independent Bank's Secured Claim, including principal, interest, late fees and expenses and subject to continuing interest, costs

17

and fees, was One Million Nine Hundred Forty-Eight Thousand Seventy-Nine and 30/100 Dollars ($1,948,079.30). Independent Bank shall receive monthly payments beginning on the fifteenth (15th) day of the first full month after the Confirmation Date and continuing on the fifteenth (15th) day of each consecutive month thereafter until the Independent Bank Secured Claim is paid in full. The first four monthly payments shall be in the amount of $20,000 and each monthly payment thereafter shall be in the amount of $40,000. The Independent Bank Secured Claim shall accrue interest at the annual rate of six percent (6%). To the extent that its Secured Claim, including all interest, costs and fees has not been paid in full, the balance shall be paid in the sixtieth (60th) month after the Confirmation Date. Independent Bank shall retain its lien until its Secured Claim is paid in full. In the event Debtor receives Net REA Claim Proceeds and/or Lee Proceeds, all of the Net REA Claim Proceeds and Lee Proceeds shall be paid to Independent Bank and applied against the Independent Bank Secured Claim; provided, however, that the amount of the Net REA Claim Proceeds and Lee Proceeds paid to Independent Bank shall not exceed the amount owing on the Independent Bank Secured Claim at the time of such payment. There shall be no prepayment penalty in the event Debtor prepays any portion of the Independent Bank Secured Claim.

18

Upon the Effective Date, the Complaint filed by the Committee against Independent Bank, which is pending before the Court in Adversary Proceeding No. 15-4042, shall be dismissed with prejudice and without costs.

**Class I is impaired.**

2. <u>Class II</u>. Class II consists of the Bloom Secured Claim. Bloom shall receive the following on account of the Bloom Secured Claim: (a) 100% of the stock of the Reorganized Debtor; (b) monthly interest payments in the amount of $3,789.47 (which is the amount of the monthly interest payments he has been receiving subsequent to the Petition Date); plus (c) possible distributions as discussed below, depending on the amount of the Net REA Claim Proceeds and Lee Proceeds. If the Net REA Claim Proceeds and Lee Proceeds total $468,572.63 or more (in which case Bloom will be a fully secured creditor), Bloom shall receive an additional $407,286.31 by (i.e., 50% of his $814,572.63 Secured Claim). At Debtor's option, such amount shall be paid to Bloom from any Net REA Claim Proceeds and Lee Proceeds remaining after payment in full of the Independent Bank Secured Claim and/or by paying $40,000 per month to Bloom once the Independent Bank Secured Claim has been paid in full. If there are not any Net REA Claim Proceeds or Lee Proceeds, Bloom shall not receive anything further on account of his Secured Claim.

If the Net REA Claim Proceeds and Lee Proceeds total less than $468,572.63, Bloom shall receive 50% of the amount of the the Net REA Claim Proceeds and Lee Proceeds, with such amount to be paid by Debtor at $40,000 per month once the Secured Claim of Independent Bank has been paid in full.

**Class II is impaired.**

3. <u>Class III</u>.  Class III Consists of the Exide Secured Claim. If the Net REA Claim Proceeds and Lee Proceeds are less than $468,572.63, then the Exide Secured Claim will be treated as a Class VI Claim.

If the Net REA Claim Proceeds and Lee Proceeds are in excess of $1,431,759.29 (i.e., $468,572.63 + $963,186.66), then Exide will be treated as a fully secured creditor and the Exide Secured Claim shall be paid in full (plus interest at 3% per annum calculated from the Effective Date). At Debtor's option, such amount shall be paid to Exide from any Net REA Claim Proceeds and Lee Proceeds remaining after payment in full of the Secured Claims held by Independent Bank and Bloom (as provided for in this Plan) and/or by paying $40,000 per month to Exide once the Secured Claims of Independent Bank and Bloom have been paid in full (as provided for in this Plan).

If the Net REA Claim Proceeds and Lee Proceeds are between $468,572.63 and $1,431,759.29, Exide shall receive 100% of the amount by which the Net REA Claim Proceeds and Lee Proceeds

exceed $468,572.63, with such amount (without interest) to be paid by Debtor at $40,000 per month once the Secured Claims of Independent Bank and Bloom have been paid in full (as provided for in this Plan), and the balance of its Claim will be treated as a Class VI Claim.

**Class III is impaired.**

4.  Class IV. Class IV consists of the secured claim of Aactron in the amount of $2,286.25. The Aactron Secured Claim shall be paid in full on the Effective Date.

**Class IV is unimpaired.**

5.  Class V. Class V consists of the secured claim of the Oakland County Treasurer in the amount of $21,484.04 the "Property Tax Claim"). The Property Tax Claim shall be paid in equal monthly payments beginning on the twentieth day of the first full month after the Confirmation Date and continuing until paid in full. The Property Tax Claim shall be paid in full within sixty (60) months of the Petition Date and shall receive statutory interest. Debtor has estimated that the Oakland County Treasurer will receive forty eight (48) monthly payments in the approximate amount of $565.76.

**Class V is impaired.**

### B.  TREATMENT OF UNSECURED CLAIMS

6.  Class VI. Class VI consists of the Unsecured Claims. Not taking into account: (a) any Unsecured Claim held by Exide;

21

or (b) Unsecured Claims to which Debtor has objected or to which Debtor may object, Debtor estimates that the Claims in Class VI total approximately $5,000,000. The holders of Allowed Class VI Claims shall receive 16% of their respective Allowed Class VI Claims (without interest). Such payments shall be paid in 32 equal monthly payments commencing on the first day of the 25th month after the Effective Date. If the Exide Secured Claim ends up being treated as a fully Unsecured Claim (which would be the case if the Net REA Claim Proceeds and Lee Proceeds are less than $468,572.63), then, not taking into account any Class VI Claim reductions from the amounts filed and scheduled, the aggregate payment amount to Class VI Creditors would be roughly $30,000 per month (and would commence at or about the time the $30,000 per month payments to pay the outstanding Administrative Expenses owing to the Professionals are expected to be paid in full).

**Class VI is impaired.**

7. <u>Class VII</u>.    Class VII consists of the Claim of K.R. Kenneth, L.L.C., Debtor's landlord under the Real Property Lease. The Real Property Lease shall be deemed to have been assumed on the Effective Date and K.R. Kenneth, L.L.C.'s Claim, in the amount of $65,228.13, shall be paid in full in eight (8) consecutive monthly payments in the amount of $8,153.52 commencing on the Payment Commencement Date.

**Class VII is unimpaired.**

8.   <u>Class VIII</u>.   Class VIII consists of the Claim of Atlee Hart. The Claim of Atlee Hart shall be resolved by Debtor providing Atlee Hart with reimbursement for medical insurance coverage going forward. Such coverage shall consist of Blue Cross Legacy C coverage and Express Scripts (with respect to prescription coverage) or as otherwise agreed upon by Debtor and Atlee Hart. In addition, Debtor shall pay $4,568.32 to Atlee Hart on the Effective Date.

**Class VIII is unimpaired.**

### C.   TREATMENT OF INTERESTS

9.   <u>Class IX.</u> Class IX consists of the Interests of Bloom as the sole shareholder of Debtor.   Bloom shall not receive or retain anything on account of being the 100% shareholder of Debtor.

**Class IX is impaired.**

### ARTICLE IV

### <u>CRAMDOWN REQUEST</u>

10.   <u>Confirmation Without Acceptance by All Impaired Classes</u>. Debtor will request the Court to confirm the Plan under section 1129(b) of the Bankruptcy Code in the event that any impaired class does not accept or is deemed not to accept the Plan.

23

## ARTICLE V

## EXECUTION AND IMPLEMENTATION OF THE PLAN

A.   <u>Funding the Plan</u>. Debtor intends to make the payments required hereunder from its ongoing operations, any Net REA Claim Proceeds, and any Lee Proceeds.

B.   <u>Continuation of the Lee Litigation</u>. On 10-15-14, the Lee Litigation was stayed and the case was administratively closed. Debtor has been communicating with some law firms about representing Debtor in connection with the Lee Litigation. Debtor is optimistic that it will retain either Clark Hill (the same firm representing debtor with respect to the REA Claim) or Sommers Schwartz to represent it in the Lee Litigation on a contingent fee basis, with Debtor being responsible for any costs incurred in connection with the Lee Litigation.

If Debtor negotiates a contingent fee arrangement with respect to the Lee Litigation, then the Confirmation Order shall contain language providing that: (a) the Lee Litigation is no longer stayed; (b) the case between Debtor and Lee pending in the United States District Court before Judge Avern Cohn shall be reopened; and (c) the claims being litigated between Debtor and Lee shall continue subject to the conditions discussed below with respect to Lee's claims against Debtor.

In its bankruptcy schedules, Debtor listed Lee as holding a "disputed" unsecured non-priority claim. As such, in order to

obtain any distribution on its claim or to vote on the Plan, Lee was required to file a proof of claim on or before the Bar Date. Debtor filed an objection to any claim of Lee when Lee failed to file a proof of claim by the Bar Date. Lee filed: (a) a response to such objection; (b) an untimely proof of claim (the "Lee Proof Of Claim"); and (c) a motion seeking to have the Lee Proof Of Claim deemed to have been timely filed. At the time of the filing of this Plan, the Court has not yet ruled on Debtor's objection with respect to the disallowance of any claim of Lee or with respect to Lee's motion seeking to have the Lee Proof Of Claim deemed timely.

If the Bankruptcy Court sustains Debtor's objection to Lee's claim and denies Lee's motion to deem its late filed proof of claim as timely, then: (a) Lee will not be entitled to any distribution from Debtor; and (b) the claims asserted by Lee in its Counterclaim in the Lee Litigation will only be able to be used to reduce/offset any affirmative recovery by Debtor from Lee in the Lee Litigation.

If the Bankruptcy Court overrules Debtor's objection with respect to Lee's claim and grants Lee's motion to have its late proof of claim deemed timely, then: (a) Lee can litigate the claims asserted by it in the Lee Litigation; (b) such claims asserted by Lee in the Lee Litigation can be used to reduce/offset any affirmative recovery by Debtor from Lee in the

Lee Litigation; and (c) to the extent Lee obtains a final non-appealable judgment against Debtor in the Lee Litigation, such shall constitute the amount of Lee's Allowed Claim - - and such shall constitute a Class VI Unsecured Claim and Lee shall be paid in the manner provided for in this Plan.

## ARTICLE VI

### EFFECT OF CONFIRMATION

A.   <u>Discharge of Claims</u>. Except as otherwise provided in Bankruptcy Code section 1141 or in this Plan, the confirmation of this Plan shall discharge Debtor from any debt that arose before the Confirmation Date, and any debt of any kind specified in Bankruptcy Code section 502(g), 502(h), or 502(i), whether or not: (a) a proof of the Claim based on such debt is filed or deemed filed under Bankruptcy Code section 501; (b) such Claim is allowed under Bankruptcy Code section 502; or (c) the holder of such Claim has accepted the Plan.

B.   <u>Injunction</u>. Except as otherwise provided in the Plan, from and after the Effective Date, all Persons who have held, hold or may hold Claims against Debtor are permanently enjoined from taking any of the following actions against Debtor: (1) commencing or continuing, in any manner or in any place, any action or other proceeding; (2) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order; (3) creating, perfecting, or enforcing any lien

26

or encumbrance; (4) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to Debtor; and (5) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained herein shall preclude such Persons from exercising their rights pursuant to and consistent with the terms of this Plan and the Confirmation Order.

## ARTICLE VII

### MODIFICATION OF THE PLAN

A.    Subject to section 1127(d) of the Bankruptcy Code, Debtor may alter, amend or modify the Plan or the exhibits to the Plan at any time prior to or after the Confirmation Date but prior to the Substantial Consummation of the Plan. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

## ARTICLE VIII

### JURISDICTION OF THE COURT

A.    This Court shall retain jurisdiction in this matter for the following reasons and purposes:

1.   The correction of any defect, the curing of any omission, or the reconciliation of any inconsistency in this Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of this Plan.

2.   The modification of this Plan after confirmation pursuant to the Bankruptcy Rules and the Bankruptcy Code and as provided as in Article VII of the Plan.

3.   To enforce and interpret the terms and conditions of this Plan and to enter orders in aid of confirmation of this Plan.

4.   Entry of any order, including injunctions, necessary to enforce the title, rights, and powers of Debtor or any party-in-interest, and to impose such limitations, restrictions, terms and conditions of such title, rights and powers as this Court may deem necessary;

5.   The adjudication of any objections to Claims filed by Debtor pursuant to Article XII of the Plan.

6.   The review and approval of all Professional fee applications for services rendered prior to the Confirmation Date and for services rendered in connection with the Plan after the Confirmation Date, to the extent that Debtor disputes all or a portion thereof.

7.   To determine any lawsuit initiated by Debtor pursuant to Chapter 5 of the Bankruptcy Code.

8.    Entry of an order converting, dismissing or closing this Case.

**ARTICLE IX**

**TITLE TO PROPERTY**

A.    Title to the property of Debtor shall vest in the Reorganized Debtor upon the Effective Date, free and clear of any claims or interests, including liens, except as expressly provided in this Plan. Debtor shall be discharged from its status as "Debtor" and its affairs and business shall be thereafter conducted by the Reorganized Debtor without Court supervision except as may be governed by Article VIII of the Plan.

**ARTICLE X**

**UNITED STATES TRUSTEE FEES**

A.    Debtor shall pay to the United States Trustee the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) within fourteen (14) days of entry of the Confirmation Order and simultaneously shall provide the United States Trustee with an appropriate affidavit indicating the cash disbursements for the relevant period. Debtor will continue to pay the requisite fees due to the U.S. Trustee. The fees due the U.S. Trustee are charges assessed against the bankruptcy estate under Chapter 123 of Title 28, are entitled to priority under Bankruptcy Code

section 507(a)(2), and are payable until such time as the case has been converted, dismissed or closed by the Bankruptcy Court.

## ARTICLE XI

### EXECUTORY CONTRACTS

A.   Unless otherwise assumed or rejected by Final Order of the Bankruptcy Court, all executory contracts of Debtor which are not as of the Confirmation Date the subject of pending applications to assume or reject, shall be deemed assumed.

B.   Any Creditor who has a Claim as a result of any rejected executory contract shall have thirty (30) days after such rejection to file a Proof of Claim, failing which such Claim shall be disallowed in its entirety.

C.   Debtor may file an objection to any Proof of Claim filed pursuant to paragraph B of this Article.

## ARTICLE XII

### OBJECTIONS TO CLAIMS

Debtor may object to the allowance of any Claim which has been listed on the schedules filed by Debtor or filed by any Creditor, within this Case, within one hundred twenty (120) days after the Effective Date.

## ARTICLE XIII

### EFFECT OF CONVERSION TO CHAPTER 7

In the event of a conversion of this Case to a case under Chapter 7 of the Bankruptcy Code, all property of Debtor,

30

Debtor-in-Possession, or Reorganized Debtor, including all property that will revest in the Reorganized Debtor pursuant to Confirmation of the Plan and all property acquired by the Reorganized Debtor subsequent to Confirmation of the Plan, shall be property of the Chapter 7 estate.

**ARTICLE XIV**

**<u>MISCELLANEOUS PROVISIONS</u>**

A.     <u>Authorizations</u>: Debtor is authorized, empowered and directed to execute such documents and take all other actions necessary and proper in order to effectuate the terms of this Plan.

B.     <u>Transactions on Business Days</u>: If the Effective Date or any other date on which a transaction or distribution may occur under the Plan shall occur on a day that is not a business day, the transactions or distributions contemplated by the Plan to occur on such day shall instead occur on the next business day following such non-business day.

C.     <u>Governing Law</u>: Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Michigan, without giving effect to the principles of conflict of laws thereof.

31

D.   Section Headings: The headings of the articles, sections and subsections of the Plan are inserted for convenience only and shall not affect the interpretation of the Plan.

E.   Notices: Any notice required or permitted under the Plan shall be in writing and served either by: (a) certified mail, return receipt requested, postage prepaid; (b) hand delivery; or (c) reputable overnight delivery service, freight prepaid, addressed as follows:

```
If to Debtor:              SSI Technology, Inc.
                           Attn:  Robert A. Bloom
                           1235 Spartan Dr.
                           Madison Heights, MI 48071


If to Debtor's Counsel:    Howard S. Sher
                           Jacob & Weingarten, P.C.
                           25800 Northwestern Highway, Suite 500
                           Southfield, Michigan 48075
```

F.   Claims Filed After the Bar Date: Except as otherwise provided in the Plan, any proof of claim not filed on or before the Bar Date which otherwise was required to be filed pursuant to the Bankruptcy Code and Rules, is disallowed.

G.   Administrative Expense Bar Date: All Administrative Expenses shall be filed within sixty (60) days after the Effective Date, or such Administrative Expenses shall be deemed waived and disallowed.

32

H. <u>Binding Effect</u>: The Plan and the Confirmation Order will be binding upon, and will inure to the benefit of, Debtor, the holders of all Claims and Interests, and their respective successors and assigns.

I. <u>Severability of Plan Provisions</u>: After the Effective Date, should any term or provision of this Plan be held by the Bankruptcy Court to be invalid, void, or unenforceable, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

J. <u>Enforcement of Liens</u>: Except as otherwise expressly provided in this Plan, no lien retained by or granted to any creditor under this Plan may be foreclosed, sold at tax sale, or otherwise enforced except upon the occurrence of a default by Debtor in its performance under the terms of this Plan.

K. <u>No Post-petition Interest</u>. Except as otherwise specifically provided for in the Plan or required by applicable bankruptcy law, Debtor shall have no obligation to pay any amount that constitutes or is attributable to interest accrued on an Allowed Claim after Petition Date. Any such amount that constitutes or is attributable to interest that has been accrued and has not been paid by Debtor shall be cancelled as of the Effective Date for federal income tax purposes.

33

L.  Compliance with Tax Requirements.  In connection with the Plan and all instruments issued in connection therewith and distributed thereon, Debtor shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions under the Plan shall be subject to such withholding and reporting requirements. All such amounts withheld and paid to the appropriate governmental unit shall be treated as if made directly to the holder of an Allowed Claim. Debtor shall be authorized to take any actions that it determines, in its reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements, including withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms it believes are reasonable and appropriate.

Notwithstanding any other provision of the Plan, each Person receiving or deemed to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax imposed on such Person on account of such Distribution, including income, withholding and other tax obligations.

M.  Contested Claims.  Debtor shall not make any distributions on any Contested Claims. To the extent any Contested Claim becomes an Allowed Claim, Debtor shall

34

immediately make all outstanding payments which would have previously been paid if such Contested Claim had been an Allowed Claim.

   N.   <u>Certain Acts Not Prohibited</u>. There shall be no prohibition against Debtor from merging, from issuing additional stock or being acquired by another person, company, partnership or corporation, or from obtaining any financing from any lender willing to provide any financing to Debtor. The obtaining of said financing shall not in any way obligate Debtor to make any earlier payments or distribution except as provided in this Plan.

   O.   <u>Avoidance Actions</u>. Upon confirmation of the Plan, only Debtor shall have standing to pursue any and all Avoidance Actions.

   P.   <u>Post-Confirmation Professional Fees</u>. Any services performed or expenses incurred by any Professional on behalf of Debtor with respect to this Case or otherwise after the Confirmation Date, shall not be subject to the prior review and approval of the Bankruptcy Court. Notwithstanding any provision of the Bankruptcy Code or Rules, including, without limitation, Rule 2016, after the Confirmation Date, no Professional shall be required to disclose to the Bankruptcy Court or the United States Trustee payments from Debtor. All fees and expenses of

35

Debtor arising after the Confirmation Date shall be billed directly to Debtor.

Q.  <u>Disbandment of The Committee</u>. Upon the Effective Date, the Committee shall be disbanded and no longer exist.

R.  <u>Change of Address</u>. In order to ensure that it receives its Distribution, each Creditor holding a Claim treated under Articles II or III must advise Debtor of any change in address. Absent any such notification, Debtor shall send payments to the address listed on the matrix on file with the Bankruptcy Court. If the payment is not negotiated within three (3) months after being mailed, it shall be void and Debtor shall have no further obligation to such Creditor.

## ARTICLE XV

### REVOCATION OF THE PLAN

Debtor reserves the right, prior to the Confirmation Date, to revoke or withdraw the Plan without notice. If Debtor revokes or withdraws the Plan as provided in the preceding sentence, or if confirmation does not occur, then the Plan will be null and void in all respects, and nothing contained in the Plan will: (1) constitute a waiver or release of any claims by or against, or any interest in, Debtor; or (2) prejudice in any manner the rights of Debtor.

36

## DISCLOSURE STATEMENT

Introduction and Overview

### A.    Purpose of Disclosure Statement

All capitalized terms, unless defined in this Disclosure Statement, shall have the meaning ascribed to them in Debtor's Second Plan of Reorganization (the "Plan"), so long as the context does not indicate a different meaning.

Debtor submits this Disclosure Statement pursuant to § 1125 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq., to all known holders of Claims against it.

Debtor provides this Disclosure Statement to its Creditors to disclose information deemed by it to be material and necessary for Creditors to make a reasonably informed decision in exercising their right to vote for the acceptance or rejection of the Plan.

### B.    Source of Information

The Disclosure Statement and the Plan have been prepared from information furnished primarily by Debtor.

The statements contained in this Disclosure Statement are made as of the date hereof, unless another time is specified. Neither the delivery of this Disclosure Statement nor any exchange of rights made in connection with it shall, under any circumstances, create an implication that there has been no

change of the facts set forth herein since the date of this Disclosure Statement.

**THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT THAT THE BANKRUPTCY COURT HAS APPROVED FOR USE IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. NO ENTITY IS AUTHORIZED BY DEBTOR TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN. INFORMATION OR REPRESENTATIONS DERIVED FROM ANY OTHER SOURCE MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY DEBTOR.**

# I.   Description of Debtor

## A.   Debtor's Incorporation and Ownership

Debtor is a Michigan corporation, of which 100% of the stock is owned by Bloom. Debtor was formed on February 17, 1972 as Signals and Systems, Inc. Bloom purchased all of the issued and outstanding stock of Signals and Systems, Inc. on October 16, 1996[1]. Pursuant to the Plan, Debtor will be reorganizing and continuing in business.

## B.   Identity of Insiders That Will Be Retained by the Reorganized Debtor

Bloom is the President, CEO, and sole member of Debtor's Board of Directors. Bloom is directly involved with all aspects of the company's operations. To that end, he has daily meetings with department heads on both tactical and strategic issues. A myriad of issues are discussed at these meetings, including: production planning; vendor and customer issues; cash flow; potential new business; and other items that have impact upon the company. As the face of the company and its main contact with its customer base, he ensures timely quotations and answers to customer requests. Bloom is a guarantor of the indebtedness owing to Independent Bank.

---

[1] The stock of Signals and Systems, Inc. was purchase by John Yeaton and Bloom. Subsequent to the date of that transaction, Bloom acquired Mr. Yeaton's shares.

39

After confirmation of the Plan, Bloom will continue to act as President and CEO of the Reorganized Debtor and will receive a salary of $200,000 per year and health care benefits (which presently costs $431.70 per month).

Sharon Bloom, Bloom's wife, is the Office/Human Resources Manager of Debtor. She is involved in the financial plans and policies of Debtor and assists with managing the daily operation of the office. She acts as custodian of Debtor's funds, and is responsible for a lot of Debtor's bookkeeping and accounting. Mrs. Bloom reviews all government contracts and assists in the preparation of the documentation necessary for outgoing shipments through various government websites, including Wide Area Work Flow (WAWF). She monitors accounts receivable to ensure timely receipt of funds. She also has responsibilities with respect to the administration of compensation policies and structures, and performance appraisal programs. She also helps to ensure that Debtor complies with governmental laws and regulations, such as OFCCP, OSHA and ERISA.

After confirmation of the Plan, Mrs. Bloom will continue to act in the same capacity on behalf of the Reorganized Debtor and will receive a salary of $100,000 per year and health care benefits (which presently costs $794.20 per month).

C.   Debtor's Business and Assets

Debtor is located in Madison Heights, Michigan and provides electronic and electro mechanical components and systems to the United States military. Debtor owns accounts receivable, light-manufacturing equipment, inventory and office furniture and equipment.

Debtor's potentially largest asset is the REA Claim. The Bankruptcy Court recently approved Debtor's retention of Clark Hill to represent it in connection with the REA Claim, which is discussed in detail below.

On December 28, 2011, the U.S. Army Contracting Command, Warren, Michigan ("TACOM") awarded Debtor Contract No. W56HZV-12-C-0058 (the "Contract"). This fixed-price Contract required Debtor to manufacture and deliver mechanical and electrical parts and assemblies as part of a program to upgrade existing Bradley Fighting Vehicles. Specifically, the Contract required Debtor to manufacture 3000 individual kits of electrical parts and assemblies as part of the Bradley Advanced Survivability Seats ("BASS-D") upgrade program. Each kit was comprised of approximately 1,000 component parts, including a Battery Box, a Battery Box Top Cover and a Battery Box Front Cover ("collectively, the "Battery Box"), which were to be manufactured in accordance with a Technical Data Package ("TDP") provided by TACOM. As required by the Contract, delivery

41

schedule, Debtor started shipping kits to TACOM at the end of June 2012. In September 2012, TACOM began issuing Defective Material Forms ("DMFs") and product quality deficiency reports to Debtor regarding manufacturing quality issues with some of the delivered Battery Boxes. Upon inspection of the returned Battery Boxes, Debtor determined that the Battery Box portion of TDP drawings and specifications were lacking in general design principles, including inconsistent, missing and ambiguous criteria. By Debtor's estimation, some critical dimensions were missing entirely. As a result, the Battery Box design created significant producibility issues, i.e., manufacturing and assembly. As later discovered, these design defects were known to TACOM before Debtor began shipping the Battery Boxes, although this information was not shared with Debtor at the time.

Debtor attempted to resolve the producibility issues through its own work-arounds in order to meet Contract delivery requirements, which burdened Debtor with additional and unanticipated costs. Under the Federal Acquisition Regulations ("FAR"), when changes to a federal prime contract cause changes to the time to produce the contracted product or services, and/or increase the cost of production or performance, a contractor is entitled to an equitable adjustment of the contract price and/or the time to perform. On February 25, 2014,

Debtor submitted a request for equitable adjustment ("REA") in the approximate amount of $4.3 million to compensate Debtor for the significant labor and other costs incurred as a result of the Contract's defective specifications. As required by U.S. Department of Defense supplement to the Federal Acquisition Regulations ("DFAR") § 252.243-7002, Debtor certified the accuracy of the REA.

As outlined in the FAR, the Contracting Officer can accept or deny the REA, or it can enter into negotiations for a mutually acceptable resolution. The Contracts Disputes Act ("CDA"), 41 U.SC. § 7101, et seq., and the Federal Acquisition Regulations ("FAR") stipulate that federal contractors may only appeal a denied REA to the Armed Services Board of Contract Appeals ("ASBCA") or the U.S. Court of Federal Claims ("COFC") after exhausting all administrative remedies. A contractor can exhaust its administrative remedies by converting an REA to a CDA "claim" by submitting a certified Final Contracting Officer's Decision ("FCOD") request to the Contracting officer. The CDA "Claim" certification is outlined in FAR § 52.233-1, and is different than the REA certification required by DFAR § 252.243-7002. Neither the ASBCA or the COFC have jurisdiction to hear an improperly certified "Claim". See e.g., *Agility Def. & Gov't Servs. v. United States*, 103 Fed. Cl. 366 (2012).

43

On April 3, 2014, the Contracting Officer issued a letter purporting to be a FCOD denying the REA, apparently triggering Debtor's appeal rights before ASBCA or the COFC. According to this FCOD, Debtor's REA was "inadequate" in that it failed to properly explain the basis for the equitable adjustment request or provide the source of the costs and estimates included in the proposal as described below. The Contracting Officer did not challenge Debtor's faulty specification allegations but rather appeared only to question Debtor's cost calculations. Although unsure as to the validity of this FCOD, Debtor nevertheless timely filed an appeal with the ASBCA (ASBCA No. 59379). On July 10, 2014, Debtor withdrew its appeal after TACOM notified Debtor it retracted the FCOD and would seek additional information regarding the REA. In December 2014, Debtor submitted the requested additional materials. On April 24, 2015, after multiple delays, the Contracting Officer issued a second FCOD denying the REA, again apparently triggering Debtor's CDA appeal rights. According to this FCOD, Debtor's increased costs were not the result of faulty specifications but rather were due to costs incurred to correct quality issues in producing the Battery Boxes and other kit parts. The FCOD did not challenge Debtor's cost calculations.

At present, the Contracting Officer has rendered two improper FCODs in response to the February 25, 2014, REA. The

44

REA did not include the CDA certification and Debtor did not request a FCOD. On July 16, 2015, Debtor requested the Contracting Officer also voluntarily rescind the second FCOD as being premature and improper. But, as with the first FCOD, Debtor has been forced to file an ASBCA appeal to protect its rights. While Debtor expects the Contracting Officer will rescind the second FCOD, ASBCA will nevertheless ultimately dismiss the Appeal until the REA is properly converted to a CDA "Claim."

Upon rescission of the FCOD or dismissal of the Appeal, Debtor will seek to engage the Contracting Officer in an attempt to finalize a negotiated equitable adjustment of the Contract. If such effort should fail, Debtor will reissue the REA with the CDA certification and will formally request a FCOD denying the REA. Should the Contracting Officer again deny the REA as a CDA "Claim," Debtor would then be able to properly pursue its $4.3 million claim before the ASBCA. The time to prosecute the Appeal through the ASBCA will mostly likely be faster than pursuing an Appeal before the COFC, usually concluding within a year. The process is generally less formal and, because TACOM is required to produce a substantial document record by ASBCA Rule 4, usually does not involve the extensive discovery often encountered in court proceedings. Also, the ASBCA strongly advocates the parties engage in alternative dispute resolution

45

proceedings. And finally, the vast majority of ASBCA appeals are resolved without the need for a trial, with the Board panel making a decision on the record on liability and encouraging the parties to resolve "quantum" or damages informally.

As discussed in greater detail in the Litigation section of this Disclosure Statement, another potentially significant asset of Debtor is the Lee Claims. As discussed therein, Debtor has been exploring options with respect to the retention of counsel to pursue the Lee Claims.

## II. Post-Petition Events of Significance

### A. Post-Petition Transfers

There have been no post-petition transfers outside the ordinary course of Debtor's business.

### B. Cash Collateral

On October 3, 2014, the Bankruptcy Court entered its Interim Order Authorizing Debtor's Use of Cash Collateral and Granting Adequate Protection and Other Relief [Docket No. 33], which was amended by the December 8, 2014 entry of the Amended Interim Order Authorizing Debtor's Use of Cash Collateral and Granting Adequate Protection and Other Relief [Docket No. 159]. On December 23, 2014 the Final Order Authorizing Debtor's Use of Cash Collateral and Granting Adequate Protection and Other Relief (as subsequently amended, extended and modified, the "Final CCO") [Docket No. 179] was entered. The Final CCO was

46

amended [Docket No. 222] on February 10, 2015, and has been extended on a number of occasions.

Among other things, the Final CCO permits Debtor to use Independent Bank's cash collateral and requires Debtor to make adequate protection payments to Independent Bank.

C.    Substitution of Debtor's Bankruptcy Counsel

On 6-23-15, the Bankruptcy Court entered an order approving Jacob & Weingarten's substitution as Debtor's general bankruptcy counsel.

D.    Litigation

On 11-22-13, Debtor commenced the Lee Litigation by filing a complaint against Lee. Lee filed a counterclaim. Both sides sought millions of dollars in damages relating to various component parts provided by Lee to Debtor. On 10-15-14, the United States District Court entered an order staying and administratively closing the case. The Lee Litigation is discussed in detail in Article V.B. of the Plan. As discussed therein, Debtor hopes to retain contingent fee counsel to represent it in connection with the Lee Litigation. If Debtor is successful in that regard, then the Lee Litigation will continue.

On 6-3-14, Debtor filed a complaint against American Precision in the United States District Court, in case no. 14-12187-MRL-RSW. Debtor recently settled the case for $15,000,

47

subject to approval by the Bankruptcy Court, and recently filed a motion with the Bankruptcy Court seeking approval of the settlement.

On 1-15-15, the Committee filed a complaint against Independent Bank in the Bankruptcy Court, in case no. 15-4042. The complaint has not yet been answered and, under the Plan, the complaint will be dismissed with prejudice.

## III. Assets and Liabilities

### A.    Liquidation Analysis

A liquidation analysis is attached hereto and incorporated by reference as Exhibit A (the "Liquidation Analysis"). In the event that the Plan is not accepted by the Creditors or is not otherwise confirmed by the Bankruptcy Court, Debtor believes that its assets would be liquidated either: (i) pursuant to a plan of liquidation under Chapter 11 of the Code; or, (ii) in a straight bankruptcy liquidation under Chapter 7 of the Code. Debtor believes that there would not be any dividend for Unsecured Creditors under either liquidation scenario. All of the proceeds from the liquidation of Debtor's assets would first go to pay secured or priority debt as shown in the Liquidation Analysis. Accordingly, Debtor expects that in a "liquidation," the Unsecured Creditors would not receive any dividend on their Claims.

Debtor believes that the Plan is fair and equitable to Creditors and it is in their best interest to vote in favor of the Plan.

B.   Risks, Conditions and Assumptions of Stated Values

Debtor has used assumed market and forced sale/auction values to determine the value of its assets. The risks, conditions and assumptions are outlined in the Liquidation Analysis.

C.   Other claims

Other than as previously discussed herein with regard to the REA Claim and the Lee Litigation, Debtor is unaware of any other claims or causes of action, including the existence of any claims against insiders.

IV.   **Implementation of the Plan**

A.   Financial Summaries

Summaries of financial information are attached as follows: (1) for the years 2012, 2013 and 2014 through September are attached and incorporated by reference as Exhibit B; (2) for the post-petition period through July 31, 2015 are attached and incorporated by reference as Exhibit C; and (3) projections for the five (5) year period of payment proposed by the plan are attached and incorporated by reference as Exhibit D. Such

includes a projected statement of operations, profit and loss, and balance sheet. The attached financial summaries come with some points to be noted:

1. Accounts Receivable: Trade are stated in terms of "Net of Customer Deposits." The statement of accounts receivable in this manner reduces the actual accounts receivable by deposits received by customers, which are a liability. The statement of accounts receivable in this manner may lead to negative amounts.

2. The projections for 2015 through 2020 assume annual sales revenue increases as follows: (a) 23% for 2015-2016; (b) 12% for 2016-2017; (c) 8.5% for 2017-2018; (d) 6.5% for 2018-2019; and (e) 6.6% for 2019-2020. The increase in sales revenues also require assumed increases in the costs of goods sold to reflect the fact that increased sales will require increased production and the proportionate increase in costs associated therewith.

3. Debtor recently hired a new sales and marketing director to augment its current sales efforts. The 5-year projections include assumed increases in sales revenues and costs (i.e., wages, etc.) attributable to the new sales person.

4. The year to-date summaries and the 5-year projections also reflect the efforts of Debtor and its financial advisor to implement cost cutting initiatives.

B.  Tax Ramifications for Continuing Entity

1.  Confirmation of the Plan and receipt of funds on account of the REA Claim will have certain tax effects to Debtor.  On the Petition Date, Debtor had approximately $1,215,000 in "Deferred Taxes" which are the result of net operating loss carry-forwards (the "NOLs") resulting from previous years' losses. Debtor's receipt of any Net REA Claim Proceeds and Lee Proceeds will either reduce or eliminate the NOLs in the year of such receipt, which will reduce or eliminate its reported deferred taxes on the balance sheet. In the event there are Net REA Claim Proceeds and Lee Proceeds in an amount equal to or greater that the NOLs, Debtor's anticipated net income going forward will result in the payment of federal and state income taxes. If the amount of the Net REA Claim Proceeds and Lee Proceeds are less than the NOLs, Debtor may have additional NOLs with which to reduce its net income for the purpose of computation and payment of income taxes.

2.  Debtor believes that the forgiveness of indebtedness which may result from a discharge granted by the confirmation of the Plan will not result in any significant adverse tax consequence to Debtor.

3.  The tax consequences to each Creditor resulting from confirmation of the Plan will vary depending upon each Creditor's particular circumstances.  Debtor recommends that

51

creditors or holders of Claims obtain independent tax counsel to advise them as to the tax consequences of the Plan.

## V.  Legal Requirements

### A.  Voting procedures

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of claims, or equity interest, that are impaired under the Plan. Accordingly, classes of claims or interests that are not impaired are not entitled to vote on the plan.

Creditors that hold claims in more than one impaired class are entitled to vote separately in each class. Such a creditor will receive a separate ballot for all of its claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. A creditor who asserts a claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.

Votes on the plan will be counted only with respect to claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities other than as disputed, contingent or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order). However, any vote

52

by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the plan and disclosure statement, each holder of such a claim or interest should vote on the enclosed Ballot either to accept or to reject the plan, and then return the ballot by mail to the debtor's attorney by the deadline previously established by the court.

Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the debtor's attorney.

B.  Acceptance

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a plan by an impaired

class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the plan.

C.  Confirmation

11 U.S.C. § 1129(a) establishes conditions for the confirmation of a plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a plan under 11 U.S.C. § 1129(a) are these:

1.  Each class of impaired creditors and interest must accept the plan, as described in paragraph V.B., above.

2.  *Either* each holder of a claim or interest in a class must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

D.  Modification

Debtor reserves the right to modify or withdraw the plan at any time before confirmation.

E.  Effect of confirmation

54

If the plan is confirmed by the Court:

1. Its terms are binding on the debtor, all creditors, shareholders and other parties in interest, regardless of whether they have accepted the plan.

2. Except as provided in the plan:

    (a) In the case of a corporation that is reorganizing and continuing business:

        (1) All claims and interests will be discharged.

        (2) Creditors and shareholders will be prohibited from asserting their claims against or interest in the debtor or its assets.

    (b) In the case of a corporation that is liquidating and not continuing its business:

        (1) Claims and interests will not be discharged.

        (2) Creditors and shareholders will not be prohibited from asserting their claims against or interests in the debtor or its assets.

55

(c) In the case of an individual or husband and wife:

    (1) Claims will be discharged, except as provided in 11 U.S.C. §§ 523 and 727(a).

    (2) Creditors will be prohibited from asserting their claims except as to those debts which are not discharged or dischargeable under 11 U.S.C. §§ 523 and 727(a).

See Part I.A. of this Disclosure Statement to determine which of the above paragraphs applies in this case.

Dated: August 14, 2015          Respectfully submitted,


SSI Technology, Inc.



By:  */s/ Robert A. Bloom*

      Robert A. Bloom

Its: President



 */s/ Howard S. Sher*
Howard S. Sher (P38337)
Jacob & Weingarten, P.C.
25800 Northwestern Hwy., Suite 500
Southfield, Michigan 48075
(248)649-1900
howard@jacobweingarten.com
*Counsel for Debtor*